**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| MATTHEW LIVERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. |
| EARL SCHENCK, Cass County Sheriff's | ) | |
| Investigator; WILLIAM LAMBERT, | ) | |
| Nebraska State Patrol Investigator; | ) | |
| CHARLES O'CALLAGHAN, Nebraska | ) | **COMPLAINT, JURY DEMAND** |
| State Patrol Investigator; | ) | **AND DESIGNATION OF PLACE** |
| SANDRA WEYERS, Cass | ) | **OF TRIAL** |
| County Sheriff's Sergeant; COUNTY OF | ) | |
| CASS, NEBRASKA, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff MATTHEW LIVERS, by his undersigned attorneys, for his complaint against

defendants EARL SCHENCK, Cass County Sheriff's Investigator; WILLIAM LAMBERT,

Nebraska State Patrol Investigator; CHARLES O'CALLAGHAN, Nebraska State Patrol

Investigator; SANDRA WEYERS, Cass County Sheriff's Sergeant; COUNTY OF CASS,

NEBRASKA, alleges as follows:

### INTRODUCTION

1.      Plaintiff brings this suit pursuant to 42 U.S.C. § 1983 against certain Cass County

and Nebraska State Patrol investigators who led the investigation of the April 17, 2006 murders

of Wayne and Sharmon Stock in Murdock, Nebraska.  That investigation is an egregious

example of police misconduct, featuring improper coercion of Plaintiff and of witnesses,

fabrication of evidence, and concealment of exculpatory evidence.  As a result of the defendants'

unconstitutional tactics, false murder charges were filed against Plaintiff, causing him to be

incarcerated for over seven months, ruining Plaintiff's reputation and his relations with close

family members, and producing anxiety and other psychological trauma that continues to the present day.  This suit is brought to redress the enormous injury that the defendants inflicted upon Plaintiff by their deliberate violations of Plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution.  This suit also seeks damages against the County of Cass, Nebraska for the County's failure to train and supervise the Sheriff's Investigator and the Sheriff's Sergeant who participated in the deliberately flawed and unconstitutional investigation of the Stock murders.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

3.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

4.      Plaintiff Matthew Livers is a citizen of the State of Texas.  At the time of his false arrest and wrongful prosecution for the murders of Wayne and Sharmon Stock, Plaintiff was a resident of Lancaster County, Nebraska.

5.      Defendant Earl Schenck, Jr. was at all times relevant to this action employed as an Investigator in the Cass County Sheriff's Office.

6.      Defendant William Lambert was at all times relevant to this action employed as an Investigator in the Nebraska State Patrol.

2

7.     Defendant Charles O'Callaghan was at all times relevant to this action employed as an Investigator in the Nebraska State Patrol.

8.     Defendant Sandra Weyers was at all times relevant to this action employed as a Sergeant in the Cass County Sheriff's Office. Defendant Weyers was the direct supervisor of Defendant Schenck at all times relevant to this action.

9.     Defendant County of Cass, Nebraska ("Cass County") is a political subdivision of the State of Nebraska.  Cass County was the employer and principal of Defendants Schenck and Weyers at all times relevant to this action.

10.    All of the individual defendants are sued in their individual capacities.  Each of the individual defendants acted within the scope of his or her employment at all times relevant to this action.  Each of the individual defendants acted under color of State law at all times relevant to this action.

## ALLEGATIONS OF FACT

### The Murders of Wayne and Sharmon Stock

11.    Wayne Stock and Sharmon Stock, who resided on their farm in rural Cass County, Nebraska, were murdered in their home in the early morning of April 17, 2006.  The murders were committed with one or more shotguns and the scene of the crime was gruesome.  Both victims had been shot at close range and were horrifically disfigured.  Blood was extensively splattered throughout the crime scene.

12.    A crime of this magnitude and brutality was virtually unprecedented in Cass County.  The Cass County and Nebraska State Patrol defendants, all of whom were experienced and knowledgeable investigators, faced extreme pressure to solve the murders in order to calm fearful and outraged residents.

13.     There was no apparent motive for the murders and the defendants initially had no suspect.  The crime scene processing yielded potentially valuable clues as to the perpetrator's identity.  At the scene, investigators recovered a red and silver-colored marijuana pipe, a silver-colored LED flashlight and a ring bearing the inscription "Love always Cori and Ryan."  None of these items belonged to the victims.

14.     The defendants recognized that the marijuana pipe, the flashlight and the ring were likely left at the scene by the perpetrator or perpetrators and that each of the three items could be examined to determine if they contained biological material on which a DNA analysis could be performed.  The Cass County and Nebraska State Patrol defendants transmitted the three items to the Douglas County Sheriff's Office Crime Lab, but did not immediately request that they be processed for DNA.

15.     The day following the murders, the Cass County and Nebraska State Patrol defendants interviewed a paper carrier who reported that he had seen a light brown or tan 4-door, mid-sized, late-model sedan with a flat tail lens assembly parked near a fence between the Stocks' property and an adjacent cemetery.  The witness reported that this car had passed him at a high rate of speed in the vicinity of the Stocks' home on the night of the murders.

16.     The Cass County and Nebraska State Patrol defendants determined that a 1998 Ford Contour belonging to William Sampson, the brother of Nicholas Sampson whom the defendants would later name as Plaintiff's co-perpetrator, may have been the automobile that the witness had observed near the scene of the Stock murders.  Defendant Lambert obtained Will Sampson's consent to seize and search the car.

17.     On or about April 20, 2006, the Will Sampson automobile was thoroughly swabbed inside and out by investigators for the Douglas County CSI (Crime Scene Investigation)

4

Division of the Douglas County Sheriff's Office. That examination yielded no blood evidence, no trace evidence and no other evidence whatsoever to connect the automobile to the Stock murders. Following the examination the Will Sampson automobile remained impounded at the City Of Omaha Vehicle Impound Facility in Omaha, Nebraska.

### Tunnel Vision: the Defendants' Narrow and Immediate Focus on Plaintiff

18.     Plaintiff is the nephew of Wayne and Sharmon Stock. In April 2006, he was 28 years old, mildly retarded and had no criminal record and no exposure whatsoever to the criminal justice system. His full scale IQ has been tested at 63, which places his intellectual functioning below 99 percent of the population at large. Plaintiff was a special education student throughout his academic school years, and as a result he suffers from low self-esteem and confidence. Subsequent testing has confirmed that Plaintiff is a highly compliant individual who is far more likely than normal persons to give in to the demands of a stressful interrogation.

19.     Although Plaintiff has the vocabulary skills of a 13-year-old, and is therefore able to some extent to mask his low intellectual functioning, Plaintiff's severe limitations are obvious to anyone who engages him in questioning for even a relatively brief period of time.

20.     Lacking any viable suspect in the Stock murder investigation, the defendants almost immediately focused their attention on Plaintiff, apparently because of their belief that a disagreement Plaintiff had had with Wayne Stock on a prior occasion might furnish a motive for the murders. In fact, Plaintiff was completely innocent of any involvement whatsoever in the Stock murders and had no knowledge of who had committed the crime.

21.     In the days between April 17 and April 25, the Cass County and Nebraska State Patrol defendants placed Plaintiff under surveillance, caused Nebraska State Patrol Officers to conduct a "trash pull" of the garbage outside of Plaintiff's home and interviewed a number of

5

Plaintiff's acquaintances, family members and former co-workers, causing rumors to circulate that Plaintiff was under investigation for murder.

22.     On the evening of April 17 and the morning of April 18, for approximately four hours, defendants Schenck and Lambert conducted an interrogation of Plaintiff in Lambert's patrol car, terminating the interrogation at approximately 3:00 a.m. on April 18.

23.     On the morning of April 18, defendants Lambert and Schenck transported Plaintiff to the Douglas County Sheriff's Office so that Plaintiff could give hair and saliva samples and provide fingerprints.  At this time, Plaintiff also agreed to submit to a polygraph examination at a time of the defendants' choosing.

24.     As of April 25, the defendants had no evidence that Plaintiff was in any way involved in the Stock murders.  No physical evidence of any kind connected him to the crime scene.  The defendants made no attempt to compare Plaintiff's DNA with the biological material on the marijuana pipe, the flashlight and the ring that had been recovered from the crime scene. If they had done so, they would have established, as later testing in fact did, that the DNA on these items could not have originated from Plaintiff, from Will Sampson or from Nicholas Sampson.

**The Defendants' False Arrest and Coercive Interrogation of Plaintiff**

25.     In the early morning of April 25, 2006, the Cass County and the Nebraska State Patrol defendants confronted Plaintiff at his home and stated their interest in interrogating Plaintiff further regarding the Stock murders.  Although Plaintiff was nervous, he initially agreed to accompany the defendants because he wanted to help in any way to solve the murders that had occurred in his family's community.

26.     The Cass County and Nebraska State Patrol defendants transported Plaintiff from his home to the Cass County law enforcement center, a distance which takes over an hour to travel.  At the law enforcement center, the defendants isolated Plaintiff in the interrogation room, a small cubicle without windows and with space enough for only a table and a few chairs that is located in the bowels of the law enforcement center.  Plaintiff was thus separated from family and friends and without legal counsel or any other form of support and assistance.

27.     Over the course of the next 11 hours, defendants Lambert, Schenck and O'Callaghan conducted an unconscionable, highly coercive interrogation of Plaintiff that ultimately caused Plaintiff to make a false, involuntary confession to murdering Wayne and Sharmon Stock.  The entire interrogation was recorded on video, making it possible to observe first hand the defendants' egregious misconduct in their interrogation of Plaintiff.  The defendants' improper interrogation tactics included but were not limited to the following:

    a.  At the time they began their interrogation of Plaintiff, on April 25, 2006, the defendants knew or reasonably should have known that Plaintiff is mildly mentally retarded; that Plaintiff is a highly compliant individual who will easily give in to the demands of an interrogation; and that Plaintiff had no prior exposure to the criminal justice system and, thus, no familiarity with his rights and responsibilities in connection with the defendants' investigation.  The defendants took advantage of these limitations by subjecting Plaintiff to a prolonged, stressful interrogation that included all of the unconscionable tactics listed in the following subparagraphs.

    b.  Over the course of the interrogation, the defendants ignored clear and obvious signs that Plaintiff was innocent of the Stock murders, including the following: (i)

for many hours, Plaintiff steadfastly and emphatically denied any involvement in the Stock murders, repeating his denial on *102 separate occasions* in the course of the interrogation; (ii) Plaintiff never minimized or attempted to excuse the perpetrator of the crime, instead forthrightly stating that the murderer should receive the most severe punishment possible; (iii) Plaintiff repeatedly exhibited total unfamiliarity with the crime scene, incorrectly describing the color of the marijuana pipe and the flashlight, incorrectly describing the color of the shotgun shells used in the crime, and incorrectly describing the perpetrators' mode of entry into the Stock home.  Properly trained, experienced investigators would recognize all of these factors as clear indications that Plaintiff was in fact innocent of the Stock murders.

c.   The defendants deliberately took steps to exacerbate Plaintiff's physical discomfort during the course of the interrogation.  Although Plaintiff advised the defendants that he had not eaten breakfast prior to being transported to the Cass County law enforcement center, the defendants did not feed Plaintiff or offer Plaintiff any food at any time during the 11 hours of their interrogation.  When Plaintiff told the defendants that he was cold and requested a blanket or that they adjust the heat in the interrogation room, the defendants ignored his requests.

d.   After more than five hours of interrogation, the defendants subjected Plaintiff to a polygraph examination.  The defendants did not administer the polygraph in order to ascertain the truthfulness of Plaintiff's denials of involvement, but rather as a further means to frighten and intimidate Plaintiff and to overbear his will. The defendants falsely informed Plaintiff that the polygraph was "foolproof" and that

the results of the polygraph were definitive and could not be disputed.  Thereafter, the defendants falsely informed Plaintiff that he had conclusively failed the polygraph examination and that he must therefore be guilty of the Stock murders. During the criminal proceedings against Plaintiff, the defendants never provided Plaintiff or his counsel with a clean, complete copy of the polygraph charts and defendant O'Callaghan's report does not explain how those charts were read.  On information and belief, the polygraph charts do not support any inference that Plaintiff was deceptive in denying participation in the Stock murders.

e.  Following the polygraph examination, the defendants became highly aggressive and accusatory in their interrogation of Plaintiff.  The defendants repeatedly and hostilely cut off Plaintiff's attempts to maintain his denials of involvement in the murders, telling him, for example, "That is just another line of shit."  The defendants employed this tactic deliberately in order to convince Plaintiff that resistance was futile and that he had no choice but to confess to the crime.

f.  The defendants falsely informed Plaintiff that there was physical evidence that connected him to the murders.

g.  The defendants repeatedly threatened Plaintiff that he would receive the death penalty if he did not confess to the Stock murders.  For example, defendant Schenck threatened Plaintiff that Schenck was "going to do my level best to hang your ass from the highest tree. You are done.  I will go after the death penalty.  I'll push and I'll push and I'll push and I will do everything I have to, to make sure you go down hard for this."  Plaintiff was told, "Your ass is on the line," and "You are on the line, you are in the frying pan right now."

9

h.   The defendants promised Plaintiff leniency if he confessed, telling him, "You cannot hide from this, okay?  Right now we are waiting on, listen to me and listen well.  This is the chance for you to save yourself.  This is potentially a death sentence.  No lie, okay?  If you are involved in this then you can save yourself now."  Based on the defendants' statements, Plaintiff actually came to believe that, because he had confessed, he would be permitted to go home.

28.   During the course of the defendants' interrogation and prior to Plaintiff making any admission of involvement in the Stock murders, the totality of the circumstances rose to a level such that a reasonable person in Plaintiff's position would not have believed that he was free to terminate the interrogation and leave.  The circumstances that would have caused a reasonable person in Plaintiff's position to believe he was not free to leave included: (a) the fact that Plaintiff is intellectually limited and had no prior experience with the criminal justice system; (b) the fact that, prior to questioning, the defendants transported Plaintiff in a police car a distance of an hour from his home; (c) the fact that the defendants confined Plaintiff in a tiny, windowless cubicle in the bowels of the Cass County law enforcement center; (d) the fact that Plaintiff was isolated from family and friends and unable to speak with a lawyer; (e) the fact that the defendants bore firearms at all times while interacting with Plaintiff; (f) the fact that, prior to the polygraph examination, Plaintiff's coat, keys and cell phone were taken from him; (g) the fact that the defendants engaged Plaintiff in increasingly aggressive, hostile, threatening and accusatory questioning within close quarters in the interrogation room.

29.   After the defendants had broken his will and Plaintiff assented that he had killed the Stocks, the defendants were unable to elicit a narrative confession from Plaintiff.  Instead, the defendants were forced to spoon feed Plaintiff's confession to him by asking a series of leading

questions regarding the commission of the crime and obtaining Plaintiff's assent to each of these questions.  In the course of eliciting Plaintiff's "confession," the defendants provided Plaintiff with a great deal of information that the investigators had learned about the crime scene, including the positioning of the bodies; the likely positioning of the perpetrators; the location of the bullet wounds on the bodies; the assumed location of the perpetrators' car during the murders; and the sequence of shots fired.  Whenever the defendants departed from the leading question format, Plaintiff displayed an inability to recite "facts" that would match the evidence at the crime scene.

30.     In his confession, Plaintiff implicated himself and his cousin, Nicholas Sampson, in the Stock murders.  Following the confession, Plaintiff was charged with murder and held in the Cass County Jail.

31.     On April 26, 2006, the day following his confession, Plaintiff recanted.  In an interview on that date, Plaintiff informed defendant O'Callaghan that everything that he had said during the duress of the interrogation on April 25 had been false.  Plaintiff said that he could not even understand how the confession had come out of his mouth, because it was not true and he would never commit such a crime.

32.     The recantation interview with Plaintiff on April 26 was also videotaped.  Although the videotape of Plaintiff's April 25 confession was immediately provided to Plaintiff's criminal counsel, the defendants did not furnish Plaintiff or his criminal counsel with the videotape of the recantation or with any police report or other corroboration of the recantation until October 2006, more than five months after the institution of criminal charges against Plaintiff.

11

**Fabrication of Forensic Evidence**

33.     Following Plaintiff's confession and recantation, one or more of the Cass County and Nebraska State Patrol defendants communicated to Douglas County crime scene investigator David Kofoed that the Will Sampson automobile had to have been involved in the Stock murders.  After this communication, Kofoed (who had not been involved in the original examination) personally examined the automobile.

34.     Investigator Kofoed prepared a report, dated May 8, 2006, in which he stated that a swab taken from under the steering column at the bottom edge of the driver's compartment dashboard tested positive for blood.  Laboratory examination of the swab later determined that the blood from the swab was consistent with that of Wayne Stock.  This "evidence" was provided to the Cass County Attorney and to Plaintiff's criminal counsel in furtherance of the prosecution of Plaintiff for the Stock murders.

35.     Prior to the defendants' assuming control of the Will Sampson automobile, Wayne Stock's blood was not present in the car.  Will Sampson, Nicholas Sampson and Plaintiff had no involvement in the Stock murders and the Will Sampson automobile was not used in any way in the course of the commission of those murders.  Cass County prosecutor Nathan Cox has stated that he does not believe the blood was found in the Will Sampson automobile as a result of accidental contamination.  Therefore, on information and belief, blood from the crime scene was planted in the Will Sampson automobile by one or more persons whose identity is not now known to Plaintiff.

**The Discovery of the True Perpetrators**

36.     In early May, 2006, Douglas County Forensic Investigator Christina Gabig traced the inscribed ring that had been found at the Stock murder scene to a Wal-Mart store in Beaver

Dam, Wisconsin, where it had been purchased by one Cori Zastrow. Further investigation revealed that Zastrow had given the ring to one Ryan Krenz, her former boyfriend; that Krenz believed he had left the ring in the glove compartment or center console of his Dodge Ram pickup truck; that the truck had been stolen during the night of April 15-16, 2006; and that two teenagers, Gregory Fester and Jessica Reid, were suspected of the theft of the truck and were in custody in the Dodge County, Wisconsin jail.

37.     Dodge County, Wisconsin authorities determined that the stolen pickup truck had been abandoned in Louisiana on April 18. They also reported that Fester had had a .410 gauge shotgun shell in his pocket at the time of his arrest. And they advised the defendants that Reid had confessed to an inmate in the Dodge County Jail that her boyfriend had shot a man and that she was worried that she might have left her fingerprints in the house while trying to clean up the blood.

38.     Further forensic investigation, undertaken in May and June, 2006, strongly linked Reid and Fester to the Stock murder scene. DNA analysis showed that biological material from the inscribed ring found at the scene was consistent with the DNA of both Reid and Fester. DNA from biological material on the marijuana pipe found at the scene was also consistent with both Reid and Fester. DNA from blood found on various areas of the stolen pickup truck was determined to be consistent with Wayne Stock's DNA. And, similarly, blood found on Reid's clothes and shoes and on Fester's clothes and shoes matched Wayne Stock's DNA.

39.     In separate interviews conducted on June 5, 2006 by the defendants and Dodge County, Wisconsin authorities, both Reid and Fester confessed to killing the Stocks.

40.     As of the end of June, 2006, based on the confessions of Reid and Fester, the clear forensic evidence tying Reid and Fester to the murder scene and the crime, the complete absence

of forensic evidence implicating Plaintiff or Nicholas Sampson, and the lack of any connection between Reid and Fester, on the one hand, and Plaintiff and Nicholas Sampson, on the other hand, it was or reasonably should have been apparent to the defendants, as seasoned investigators, that Reid and Fester had committed the Stock murders and that Plaintiff and Nicholas Sampson were not involved.

### Further Evidence Fabrication: Coercive and/or Manipulative Interviews of Reid, Fester and Ryan Paulding

41.     Notwithstanding the overwhelming evidence that Reid and Fester had committed the Stock murders while acting alone, the defendants took no steps to have the murder charges against Plaintiff and Nicholas Sampson dismissed and instead attempted to fabricate additional "evidence" that Plaintiff and Nicholas Sampson had committed the crime.

42.     On June 5, 2006, defendants Schenck and Lambert interrogated Reid in Wisconsin regarding the murders.  Schenk and Lambert employed tactics similar to those they had used to coerce Plaintiff's confession, including threatening Reid with the death penalty if she did not implicate Plaintiff and Nick Sampson as co-perpetrators of the crime, knowing full well that Reid, as a juvenile, could not be given the death penalty; promising Reid leniency if she would implicate Plaintiff and Nick Sampson; and suggesting to Reid a scenario under which she and Fester had committed the murders together with Plaintiff and Nick Sampson.  In the course of their interrogation, Schenck and Lambert told Reid that others in addition to Reid and Fester must have been involved based on the purported fact that blood from the crime scene had been found in the Will Sampson automobile.

43.     As a result of the coercive and improper tactics of defendants Schenck and Lambert, Reid identified a photo of Nick Sampson and stated that Sampson and one other person had been in the Stock home with Reid and Fester on the night of the murders.  When shown a

picture of Plaintiff, however, she insisted adamantly that the other person with Sampson was not Plaintiff.  In the days following this statement, in interviews with a Wisconsin investigator (with Schenck and Lambert no longer present), Reid admitted participating in the murders with Fester, but also repeatedly and emphatically denied that anyone else had been involved.

44.     Also on June 5, defendants Schenck and Lambert interrogated Fester.  Fester displayed an intimate knowledge of the crime scene and of the crime itself.  He repeatedly asserted that he and Reid had acted alone and that no others were involved.  Despite Fester's assertions, defendants Schenck and Lambert manipulated Fester into implicating Plaintiff and Nick Sampson as co-perpetrators, telling Fester that others were already in jail for the crime; threatening Fester that he would face a much greater charge unless he implicated Plaintiff and Nick Sampson; and, through leading questions, suggesting a scenario under which he and Reid had committed the murders together with Plaintiff and Nick Sampson.

45.     As a result of the coercive and improper tactics of defendants Schenck and Lambert, Fester ultimately made statements implicating two Nebraska men as co-perpetrators in the murders.

46.     In July 2006, defendants Weyers and Schenck traveled to Mansfield, Texas to interrogate one Ryan Paulding, who had been a classmate of Plaintiff in special education classes, and who, like Plaintiff, is intellectually limited.  Plaintiff had visited Paulding in March 2006.

47.     Defendants Weyers and Schenck interrogated Paulding for over 13 hours over the course of two days in an ultimately unsuccessful effort to elicit an admission that Plaintiff had told Paulding that he was involved with Reid and Fester in the commission of the Stock murders. The defendants attempted to coerce and manipulate Paulding by, among other things, telling him

that he had failed polygraph examinations and threatening to prosecute Paulding for conspiracy to commit murder.

### Cass County Policies, Practices and Customs Caused the Violations of Plaintiff's Constitutional Rights

48.     Cass County does not provide adequate training to its Sheriff's investigators in the conduct of criminal investigations.  In particular, Cass County does not provide adequate training on how to interview witnesses and how to interrogate suspects, including (a) how to recognize and respond to suspects and witnesses who are mentally retarded or suffer from psychological limitations; (b) the critical importance of not contaminating witnesses and suspects with information about the crime known only to investigators; (c) how to recognize that a suspect's denials of involvement are truthful; (d) the need to avoid threats and other coercive interrogation techniques; (e) how to recognize that the statement of a witness or suspect is not truthful; (f) how to properly elect a reliable confession narrative from a suspect.

49.     Cass County does not provide adequate training in other aspects of criminal investigation, including (a) the need to avoid tunnel vision in conducting an investigation; (b) how to determine the existence of probable cause for arrest and what constitutes an arrest for Fourth Amendment purposes; (c) how to make use of forensic technology in the course of a criminal investigation.

50.     The need for adequate training in the areas set forth in the preceding paragraphs is patently obvious.  In failing to adopt adequate training policies in these areas, Cass County was deliberately indifferent to the rights of persons who might be victims of a crime, witnesses to a crime or suspected of committing a crime.

51.     Cass County's failure to provide adequate training in the areas set forth in paragraphs 48 and 49 above caused the injuries to Plaintiff that are described below.

### Dismissal of the Criminal Charges against Plaintiff

52.     On December 6, 2006, after Plaintiff had spent over seven months in the Cass County Jail facing trial and a possible death sentence on double murder charges, the Cass County Attorney finally dismissed the criminal case against Plaintiff.  At the time of the dismissal, the State was facing a hearing regarding the admissibility of Plaintiff's confession.  A State expert, after reviewing the findings of Plaintiff's expert, concurred with the Plaintiff's expert's findings that defendants Schenk and Lambert had used psychological coercion to obtain Plaintiff's confession, that Plaintiff, due to his low intellectual functioning and suggestibility, was especially vulnerable to such heavy handed tactics, and that Plaintiff's confession was not reliable and should not be admitted in evidence.

53.     Although the State was forced to concede, in dismissing the criminal case, that it had no evidence against Plaintiff and could not try him for the Stock murders, neither the State nor any official of Cass County has ever offered Plaintiff an apology for his mistreatment.

### Plaintiff's Injuries

54.     Plaintiff has suffered and continues to suffer enormous injury as a direct and proximate result of the defendants' misconduct.  As a result of the defendants' investigation and wrongful charging of Plaintiff with the murder of Plaintiff's aunt and uncle, the relationships between Plaintiff (and his parents) and members of Plaintiff's extended family were destroyed. Based on nothing more than the defendants' suspicions of Plaintiff and the criminal charges against Plaintiff, members of the family came to believe, and still believe, that Plaintiff must have been involved in the murders.  Plaintiff's relationships with his family members were extremely important to him and he has suffered greatly and continues to suffer from the needless destruction of these relationships.

55.     Plaintiff was subjected to an abusive and intimidating interrogation during which the defendants belittled Plaintiff, threatened him with the death penalty, ridiculed his truthful denials of involvement in the Stock murders and coerced him into confessing against his will to an horrific crime involving his own family members of which he was completely innocent.

56.     Plaintiff spent over seven months confined in the Cass County Jail without bond facing a possible death sentence.  Because of Plaintiff's intellectual limitations and lack of any prior exposure to a Jail environment, this confinement was particularly lonely and arduous. Plaintiff suffered great mental anguish from not knowing whether he would be wrongfully convicted of the murder charges and either sentenced to death or to a very lengthy prison term.

57.     Plaintiff continues to suffer fear, anxiety, alienation from his own family, and other ongoing psychological ill effects as a result of the defendants' abusive interrogation, the wrongful murder charges that the defendants caused to be lodged against him and the months of arduous confinement without bond in the Cass County Jail.

## COUNT I
### (Due Process – Coercive Interrogation and Fabrication of Evidence)

58.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

59.     This Count I is brought pursuant to 42 U.S.C. § 1983 against defendants Schenck, Lambert, O'Callaghan, Weyers and Cass County for violation of Plaintiff's rights under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution not to be deprived of liberty without Due Process by subjection to an interrogation and other misconduct that is extreme, outrageous and shocking to the conscience.

60.     Defendants Schenck, Lambert and O'Callaghan coerced a false confession from Plaintiff to the murder of Wayne and Sharmon Stock.  In order to accomplish their coercion, the defendants engaged in extreme, outrageous and conscience-shocking behavior, including but not

limited to the following: (a) the defendants took advantage of Plaintiff's intellectual limitations, as reflected in the fact that Plaintiff is mildly mentally retarded with an IQ tested at 63, that Plaintiff was a special education student throughout his academic schooling and that Plaintiff was completely unfamiliar with the criminal justice system at the time of the defendants' misconduct; (b) the defendants isolated Plaintiff from family and friends and any legal advisor by confining him in a small, windowless interrogation room for a period of 11 hours and restricting his freedom of movement during which time they engaged Plaintiff in increasingly hostile and abusive questioning; (c) the defendants bullied and intimidated Plaintiff, by among other things, cutting off his denials of involvement, belittling Plaintiff for his intellectual limitations and ridiculing Plaintiff's protestations of innocence; (d) the defendants disregarded the fact that, in the course of their interrogation, Plaintiff made more than 100 denials of involvement in the murders; (e) the defendants lied to Plaintiff, telling him they had physical evidence connecting him to the crime scene and that he had failed a "foolproof" polygraph examination; (f) the defendants repeatedly and graphically threatened Plaintiff with the death penalty unless his confessed to the murders; (g) the defendants told Plaintiff he could "save himself" only by confessing; (h) after the defendants had broken Plaintiff's will, they spoon fed him his confession through extensive use of leading questions and ignored obvious indications from his responses that Plaintiff in fact lacked any knowledge about the crime.

61.     In furtherance of their scheme to deprive Plaintiff of his liberty, the defendants named in this Count I knowingly, intentionally and maliciously fabricated evidence purporting to link Plaintiff and Nicholas Sampson to the Stock murders.  In addition to the coercion described in the preceding paragraph, this misconduct included but is not limited to the following: (a) defendants Lambert and Schenck manipulated and coerced Gregory Fester and Jessica Reid, the

true perpetrators of the Stock murders, into falsely stating that they had committed the crime in collusion with Plaintiff and Nicholas Sampson and (b) defendants Schenck and Weyers attempted to manipulate and coerce Ryan Paulding, an intellectually limited special education classmate of Plaintiff, into falsely stating that Plaintiff had made statements to Paulding that Plaintiff committed the Stock murders in collusion with Fester and Reid.

62.     Each of the individual defendants named in this Count I acted knowingly, intentionally and with malice.  Each individual defendant was deliberately indifferent to Plaintiff's constitutional rights.

63.     Defendant Cass County is liable for the misconduct of defendants Schenck and Weyers because the policies, customs and practices of Cass County caused the constitutional violations alleged in this Count I as more fully alleged above.

64.     As a direct and proximate result of the defendants' misconduct as described in this Count I, Plaintiff suffered injuries as more fully alleged above.

## COUNT II
### (False Arrest)

65.     Plaintiff repeats and realleges the foregoing paragraphs as if fully alleged herein.

66.     This Count II is brought pursuant to 42 U.S.C. § 1983 against defendants Schenck, Lambert, O'Callaghan and Cass County for violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution not to be subjected to unreasonable seizure.

67.     On or about April 25, 2006, defendants Schenck, Lambert, O'Callaghan and Weyers caused Plaintiff to be arrested and detained without probable cause in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

68.     Following their unlawful arrest of Plaintiff, the defendants named in this Count II caused Plaintiff to be subjected to a coercive interrogation that ultimately resulted in Plaintiff confessing falsely to the murders of Wayne and Sharmon Stock.

69.     Plaintiff's false confession and his wrongful confinement without bond in the Cass County Jail were the fruit and the proximate result of the defendants' violation of Plaintiff's Fourth and Fourteenth Amendments as alleged above.

70.     Each of the individual defendants named in this Count II acted knowingly, intentionally and with malice.  Each individual defendant was deliberately indifferent to Plaintiff's constitutional rights.

71.     Defendant Cass County is liable for the misconduct of defendants Schenck and Weyers because the policies, customs and practices of Cass County caused the constitutional violations alleged in this Count II as more fully alleged above.

72.     As a direct and proximate result of the defendants' misconduct as described in this Count II, Plaintiff suffered injuries as more fully alleged above.

### COUNT III
### (Due Process – Concealment of Exculpatory Evidence)

73.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

74.     This Count III is brought pursuant to 42 U.S.C. § 1983 against defendants Schenck, Lambert, O'Callaghan, Weyers and Cass County for violation of Plaintiff's rights under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution not to be deprived of liberty without Due Process by concealment of exculpatory evidence.

75.     After criminal charges were filed against Plaintiff for the murders of Wayne and Sharmon Stock, the defendants named in this Count III concealed exculpatory evidence from

Plaintiff and his criminal defense counsel and from the prosecution and the Court. The

exculpatory evidence that the defendants concealed includes but is not limited to the following:

(a) the videotape and transcript from the defendants' interview with Plaintiff on April 26, 2006 in

which he recanted his confession, given and recorded on the prior day; (b) legible charts from the

polygraph examination administered to Plaintiff on April 25, 2006; (c) further and additional

exculpatory evidence not yet known to Plaintiff.

76.     Each of the individual defendants named in this Count III acted knowingly,

intentionally and with malice. Each individual defendant was deliberately indifferent to

Plaintiff's constitutional rights.

77.     Defendant Cass County is liable for the misconduct of defendants Schenck and

Weyers because the policies, customs and practices of Cass County caused the constitutional

violations alleged in this Count III as more fully alleged above.

78.     As a direct and proximate result of the defendants' misconduct as described in

this Count III, Plaintiff suffered injuries as more fully alleged above.

## COUNT IV
### (Conspiracy)

79.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

80.     This Count IV is brought pursuant to 42 U.S.C. § 1983 against defendants

Schenck, Lambert, O'Callaghan and Weyers for conspiracy to violate Plaintiff's rights under the

Fourth, Fifth and Fourteenth Amendments to the United States Constitution as more fully alleged

above.

81.     The individual defendants named in this Count IV and other co-conspirators not

yet known to Plaintiff reached an agreement amongst themselves to coercively interrogate

Plaintiff in an extreme and outrageous manner, to fabricate evidence and manipulate witnesses,

to falsely arrest and detain Plaintiff and to conceal exculpatory evidence, all in violation of Plaintiff's constitutional rights as described above.

82.     In this manner, the individual defendants named in this Count IV, acting in concert with other unknown co-conspirators, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

83.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

84.     Each of the individual defendants named in this Count IV acted knowingly, intentionally and with malice.  Each individual defendant was deliberately indifferent to Plaintiff's constitutional rights.

85.     As a direct and proximate result of the defendants' illicit agreement as described in this Count IV, Plaintiff suffered injuries as more fully alleged above.

## COUNT V
### (Failure to Intervene)

87.     Plaintiff repeats and realleges the foregoing paragraphs as if fully alleged herein.

88.     This Count V is brought pursuant to 42 U.S.C. § 1983 against defendants Schenck, Lambert, O'Callaghan, Weyers and Cass County for failure to intervene to prevent the violation of Plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution as more fully alleged above.

89.     In the manner described above, during the constitutional violations described above, one or more of the individual defendants named in this Count V (and other as-yet-unknown individuals) stood by without intervening to prevent the misconduct.

23

90.     Each of the individual defendants named in this Count V acted knowingly, intentionally and with malice.  Each individual defendant was deliberately indifferent to Plaintiff's constitutional rights.

91.     Defendant Cass County is liable for the misconduct of defendants Schenck and Weyers because the policies, customs and practices of Cass County caused the constitutional violations alleged in this Count V as more fully alleged above.

92.     As a direct and proximate result of the defendants' misconduct as described in this Count V, Plaintiff suffered injuries as more fully alleged above.

**PRAYER FOR RELIEF**

Plaintiff prays for the following relief:

A.     That this Court enter judgment in Plaintiff's favor and against each of the defendants named herein and award Plaintiff sufficient compensatory damages to compensate him for his injuries.

B.     That this Court also award Plaintiff sufficient punitive damages to punish and deter the named individual defendants for their misconduct as alleged herein.

C.     That this Court award Plaintiff attorneys fees pursuant to 42 U.S.C. § 1988.

D.     That Plaintiff be awarded his costs of suit.

E.     For such further and additional relief as this Court may deem equitable and just.

## JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

Plaintiff demands that this case be tried to a jury in Omaha, Nebraska.

**MATTHEW LIVERS**
Plaintiff


By:      /s/Robert W. Mullin
Robert W. Mullin, NSBA #12974
LIEBEN, WHITTED, HOUGHTON,
SLOWIACZEK & CAVANAGH,
P.C., L.L.O.
100 Scoular Building
2027 Dodge Street
Omaha, NE 68102
402-344-4000; 401-930-1099 (fax)
bmullin@liebenlaw.com

**OF COUNSEL:**

Locke E. Bowman
MacArthur Justice Center
Northwestern University School of Law
357 E. Chicago Ave.
Chicago, IL 60611
312-503-0844

Steven A. Drizin
Center on Wrongful Convictions
Northwestern University School of Law
357 E. Chicago Ave.
Chicago, IL 60611
312-503-6608

266449